City of Chicago v. Enright.

## City of Chicago v. Thomas Enright.
### Gen. No. 13,556.

MASTER AND SERVANT—*what essential to recovery by latter of former.* In order that a servant may recover for personal injuries alleged to have been sustained by him, it is incumbent that he establish, first, a neglect of duty by the master, and, second, the exercise of reasonable care by himself.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. P. W. GALLAGHER, Judge, presiding. Heard in this court at the March term, 1907. Reversed. Opinion filed December 23, 1907. Rehearing denied January 9, 1908.

**Statement by the Court.** Appellee was plaintiff and appellant defendant in the trial court, and will

be so referred to hereafter. The plaintiff recovered judgment for the sum of $4,500, from which judgment this appeal is. The declaration, as originally filed, contains eight counts, to which three counts were added by leave of the court.

The first count avers that July 28, 1900, the defendant was constructing an intercepting sewer at Forty-seventh street, in the city of Chicago, and used in said work a derrick and appurtenances, a bucket for hoisting earth from the sewer, and a certain framework and braces, and plaintiff was a laborer in defendant's employ in said work. Defendant negligently constructed said framework and braces in an unsafe and improper way, and while plaintiff was at work in said sewer and using due care for his safety, defendant, through certain of its agents, not fellow-servants of plaintiff, was hoisting earth from said sewer, said bucket, in its ascent, struck one of said braces, causing it to fall, to-wit, twenty feet, upon plaintiff's head, and seriously and permanently injured him.

The negligence averred in each of the second, third, fourth and fifth counts is the maintaining of the hoisting apparatus in an unsafe condition, so that when defendant, through its agents, who were not plaintiff's fellow-servants, were hoisting earth from the sewer in said bucket, the bucket struck one of the braces and it fell, etc.

The sixth count avers that the defendant used, in the work of hoisting earth from the sewer, a signal man, one Charles Powers, stationed above the plaintiff, to give signals to the engineer, Dave Reed, who was operating the engine, to raise and lower the bucket, and that defendant, through the joint negligence of Powers and Reed, who were not plaintiff's fellow-servants, negligently operated the engine and derrick, so that, in hoisting a bucket of earth, the bucket struck one of the braces, causing it to fall, etc.

The negligence averred in the seventh count is that of the defendant by the engineer, Reed, not a fellow-

servant of plaintiff, in hoisting a bucket of earth, causing it to strike a brace, which caused the brace to fall.

The eighth count is the same as the seventh, except that it counts only on the negligence of Charles Powers, the signal man.

The defendant demurred to the original declaration and each count thereof, but subsequently pleaded to it the general issue.

The negligence averred in the first additional count is that the defendant, by its servants, who were not fellow-servants of the plaintiff, negligently constructed said derrick, with appurtenances, and said bucket, framework and braces, in an unsuitable and unsafe manner, and said bucket, in the course of the work, came in contact with a brace, "and by reason of said negligence of construction," the brace, by said contact, became loose and fell, etc.

The second additional count, as amended, is substantially the same as the first additional count, except it avers that the defendant had notice of the alleged defects, or would have had notice in time to repair them, had it exercised ordinary care.

The negligence averred in the third additional count is that the defendant negligently failed to give reasonably safe supervision and direction in respect to the work, by reason of which the bucket came in contact with a brace and the brace became loose and fell, etc.

The defendant demurred to each of the three additional counts, and the court sustained the demurrer to the second additional count and overruled the demurrer to the first additional count, and gave leave to plaintiff to file an amended second additional count, which is the amended second additional count, the substance of which has been stated.  No disposition seems to have been made of the demurrer to the third additional count.  The defendant elected to stand by the demurrer to the first additional count.  This left the pleadings thus: General issue to the original declaration and amended second additional count, de-

murrer to first additional count overruled and defend-
ant elected to stand by demurrer, and demurrer to
third additional count not ruled on. In this state of
the pleadings the parties went to trial. The court, by
defendant's request, submitted to the jury these special
interrogatories, to each of which the jury answered
"Yes":

"Was the plaintiff, Thomas Enright, at the happen-
ing of the alleged accident, co-operating with Rice,
Powers and Hanrahan and others in the particular
business of removing earth from the bottom of the
sewer?"

"Was Thomas Enright, plaintiff in this case, a fel-
low-servant with Powers, Rice and Hanrahan?"

The jury found for the plaintiff and assessed his
damages at the sum of $4,500, and judgment was ren-
dered on the verdict.

The defendant, at the close of the evidence, moved
the court to take the case from the jury, and the court
refused so to do.

JOHN R. CAVERLY, for appellant; ROBERT C. COOK
and STEDMAN & SOELKE, of counsel.

WILLIAM E. MASON and JOHN C. KING, for appellee;
JAMES D. POWER, of counsel.

MR. JUSTICE ADAMS delivered the opinion of the
court.

The accident occurred July 28, 1902, and plaintiff
was between twenty-nine and thirty years of age at
that time. He was in defendant's employ and he had
been working as bottom digger in the sewer for eight
or nine weeks when the accident happened. The de-
fendant was engaged in the construction of a north and
south intercepting sewer from Thirty-ninth street to
Fifty-first street, on the shore of Lake Michigan east
of the railroad tracks of the Illinois Central Railroad
Company, in the city of Chicago, and the work had

progressed nearly to Forty-seventh street at the date of the accident, and the sewer was, at that date, twenty-one feet wide by twenty feet deep. It was necessary, in the removal of the earth, to protect the sides of the sewer in order to prevent them from falling in as the work progressed. This was done by the use of a framework consisting of stringers, braces and sheathing. At the time of the accident the construction of the protecting work, as testified by Corbett, witness for defendant, and who was general foreman for the city in the intercepting sewer department, and had charge of the work in question, was as follows: Eight by ten or ten by ten inch timbers twenty-two feet in length, called stringers, ran north and south at the top part of the sewer. Below these were two other sets of stringers of the same dimensions. The distance between the top row of stringers and the next row below it was about four feet six inches, and the distance between the second and third rows from the top was the same. Outside of and next to the stringers there was a three-lap Wakefield sheeting. Braces about eight by ten or ten by ten inches, and of sufficient length, ran east and west across the sewer between the opposite stringers. The braces were eleven feet apart, so that one would be from center to center of opposite stringers, and one each at the joint, where the ends of the stringers came together.

A cleat was nailed to the stringer which extended four inches over the top of the brace, and was nailed to brace and stringer with sixty-penny nails. There were three sets or rows of braces, the second and third rows being directly below the top row. The upper braces were kept in place by the cleats and by the pressure of the sand, which was about twelve feet deep, against the sheathing, which was outside of and next to the stringers. Corbett testified: "The ordinary, customary and usual construction in vogue by engineers in the matter of construction of ditches of that character is the same as we used out there," and

Albert W. Shaw, supervising engineer in charge of the work, also so testified.

The hoisting apparatus consisted of an engine, derrick, chain and buckets. The engine was situated at such a distance from the bank of the sewer that the engineer, David Reed, could not see into the sewer. A signal man, Thomas Powers, stood on the bank, where he could see into the sewer, and signaled the engineer when to hoist and lower the buckets, which were constantly ascending loaded with earth, and descending empty, as the work proceeded. Hanrahan, plaintiff's witness, testified the buckets used were five feet long, four feet wide and three feet high, so that, assuming these to be the inside measurements, the bucket would hold sixty cubic feet of earth, or something over two cubic yards. Each bucket had a dog on it and was so constructed that the side or end on which the dog was could be opened. The chain which hung from the derrick was hooked onto the bucket in three places. The spaces between the rows of braces are called sections, and there were four bottom diggers in each section, whose duty it was to fill a bucket when it descended into their section. Plaintiff was in one of these sections and was engaged in shoveling earth into a bucket while another bucket which he had assisted in filling was ascending. The ascending bucket struck a top east and west brace, and the brace fell onto a brace below it and turned and struck the plaintiff a glancing blow. The plaintiff was stooping down at the time at his work. Dr. Moore, plaintiff's witness, testified that he examined plaintiff on the day of and after the accident, and found discoloration on his head, the area of which was about the size of the palm of one's hand, and also discoloration of the right side of the neck, the right shoulder and the right hip.

Michael Flately, witness for plaintiff, who was a bottom digger in the same section with the plaintiff, and helped to fill the ascending bucket, testified that the bucket, in ascending, swung and struck the top

brace and turned it, and it dropped on another brace and turned and struck the plaintiff. The witnesses for plaintiff, as to the accident, were Michael Walsh, Michael Flately and John Hanrahan. Walsh was carrying cement for the brickmen to a platform consisting of boards laid across the cross braces, and was about thirty feet north of plaintiff when the accident occurred. He testified that it was a top brace which fell and hit the plaintiff. Flately, whose testimony has already been referred to, testified that they had been doing the work in the same way, with the same kind of buckets and appliances, for three months, and that the buckets had always been taken up in the same way. He also testified: "That big heavy brace, that goes east and west across the ditch, goes inside the sheathing, beyond the sheathing, so that this beam structure at the top forms a support on the big heavy crossing." Also, "The only way this timber could get out, at that time, was by being struck by something. That is the only way it could get out. No, the timber that I speak of, as having seen fall, did not fall by reason of its own weight. The bucket just tilted against it. The bucket was coming up; I watched it; I seen it give two turns before it got to the top. It gave two turns before it got to the top. It gave a twist around the rope, spun around. I was after filling the bucket, and I stepped to one side to get away from it." He further testified that he had seen the bucket swing at the sewer before; that the cable was liable to swing at any time.

John Hanrahan testified that he was working at the sewer as a brick tosser and, at the time of the accident, was standing on the scaffolding watching the diggers working, and saw the beam from the time it started; that the rising skip (meaning the loaded bucket) struck against it, and it bounded and went to the bottom. He also testified, referring to the bucket: "There is what they call a dog put on to the opening end, and if it is struck on a beam and loses its place, of course you have to look out for it. If the dirt is piled up more at one end, it is thrown more to the back end of the

bucket than to the forward end. I never noticed it had any particular effect. Oh, yes; I noticed that—that it made a swing when the chain picked it up, when it was loaded in a particular way. That, certainly, is a common occurrence with buckets.''

Under the pleadings it was incumbent on the plaintiff either to prove that the defendant did not exercise reasonable care to provide reasonably safe hoisting apparatus and appliances, or that it did not exercise reasonable care to make the brace which fell reasonably secure and safe. There is no evidence whatever that there was any defect in the hoisting apparatus or appliances, and this is not claimed by plaintiff's counsel in their argument, which is mainly devoted to the proposition that the brace was insecurely fastened. Plaintiff's counsel say: ''There is evidence in the record from which the jury properly found that the appellant was guilty of negligence, in constructing the top brace in an unsafe and insecure condition.'' Counsel then proceed to argue that while the lower braces were securely fastened by means of screws, the upper ones depended entirely for support on the pressure of the bank against the sheathing. Notwithstanding the question is not, whether the lower braces were more securely fastened than the upper ones, but whether the upper ones were in a reasonably safe condition, we will refer to the evidence as to this objection. Corbett testified, in regard to the braces: ''The braces and the stringers were held in place by a screw. There was a screw inserted in the end of the brace, into this ten by ten, with an iron cap, and they were set up against an oak shoe and thoroughly adjusted; just a simple screw. At the top there was a solid brace; that is, when we started it we set in the solid set of stringers first, to guide our sheeting that we set in for a guide. There was a guide outside and a guide inside— a plank to keep them from spreading. These braces were all fastened to the stringers.'' He further says: ''It was a sand top. Any time you get a sand top, you can stick in solid braces and she is there, just as

firm as if you put all the screws in the world on it. The weight of the sand falls against the brace and squeezes the braces together.'' The bottom part of the ditch is clay, which the witness proceeds to show is stationary, while the sand moves automatically, and presses against the sheathing, and that screws are attached to the lower braces, so that if they become loose for any reason, they can be tightened up by turning the screws.

Nelson, who did the bracing, under Corbett's supervision, testified that whether the braces have screws attached or are solid, it is the outside pressure which holds them.

On cross-examination of Corbett this occurred:

''Q. How far down would the first brace be? A. The first brace would probably be three feet.''

This corresponds with the testimony of the plaintiff's witness, Flately, who was examined and answered as follows:

''Q. What do they support those timbers with, those big heavy ones? A. They put another brace across the ditch going east and west; that holds them up.

Q. And that big heavy brace that goes east and west across this ditch, holding the ends of those heavy timbers, that goes beyond the sheathing, doesn't it, clear outside of the sheathing? A. Yes, goes outside the sheathing.

Q. So that this beam structure at the top forms a support on the big heavy cross-beams? A. Yes.''

Walsh testified that the sheathing sometimes widened at the top, and Flately testified: ''There is a brace across at the joint and a brace in the middle, and at the top work those braces are put across there in between those timbers, and then wedges driven in there with a sledge; yes, that is the way; and that squeezes so tight that those timbers that run along the side are held up against the sheathing, except when the sand runs from the bottom of it, it takes the sand away and the sheathing is loose.''

Counsel for plaintiff rely on this and other similar evidence, but there is not a particle of evidence that there was any spreading of the sheathing at the time of the accident. The evidence is to the contrary. Corbett testified, on cross-examination by plaintiff's counsel: "We examined the braces in the morning and evening, and we made that a custom, with no results from it. I remember that I examined that brace on this morning. I want to state that I examined that brace every morning and evening, and I got no results from it. They were always there tight, but I made that a rule, when I started on the job, to go over them every morning and night."

The cause of the accident, as shown by the evidence, was the swaying or tilting of the loaded bucket against the side of the brace, in its ascent. This is admitted by plaintiff's counsel in their argument, and is abundantly supported by the evidence. It is not claimed that there was any negligence in the hoisting of the bucket, and if it were so claimed it could not avail the plaintiff. If the swaying or turning of the bucket in its ascent was owing to its being loaded more heavily at one end or side than at the opposite end or side, then the negligence, if any, was that of the bottom diggers who loaded the bucket, who were plaintiff, Flately and others, and who were fellow-servants. If the swaying or turning was owing to the manner of hoisting, then the negligence, if any, was that of the signal man and the engineer, or one of them, who were fellow-servants of the plaintiff. Sheehan v. Prosser, 55 Mo. App. 54; Ryan v. McCully, 123 Mo. 636. There is no evidence of negligence of the engineer or signal man. The jury found that the plaintiff was a fellow-servant with Powers, Rice and Hanrahan. Counsel for defendant say that the name Rice in the interrogatories is evidently a misprision; that Reed was intended. We cannot say the jury intended Reed. We have examined the original interrogatories. They are in typewriting, and the name written is plainly Rice, and not Reed.

City of Chicago v. Enright.

The weight of the cross-brace which fell is estimated at 450 to 700 pounds, Corbett testifying to the former and one of plaintiff's witnesses to the latter weight. The bucket used, in view of its dimensions, as shown by the evidence, holds about sixty cubic feet. The standard weight of clay, which was the bottom material with which the bucket was loaded, is, by works on engineering, from 110 to 120 pounds per cubic foot. Sixty cubic feet, weighing 110 pounds per cubic foot, weigh 6,600 pounds, and this weight plus the weight of the bucket was the weight of a full bucket. This weight multiplied by the velocity with which the bucket moved when it struck the brace (which the evidence does not show) would give the momentum or force of the blow. It is evident that the force of the blow must have been very largely in excess of the weight of the brace, and caused, as we think, the fall of the brace. Our conclusion is that the defendant was not negligent as charged in the declaration, and that the falling of the brace was a mere accident, without legal fault of anyone, and that the court erred in denying the defendant's motion, made at the close of the evidence, to instruct the jury to find the defendant not guilty.

Counsel for plaintiff contend that the defendant is not in a position to object that the evidence does not establish the plaintiff's case, because defendant's demurrer to the third additional count of the declaration was overruled, and the defendant elected to stand by its demurrer, and plaintiff was, therefore, entitled to judgment on the count. No authority is cited in support of this view, nor do we know of any. The plaintiff did not ask for judgment on the first additional count, wisely, as we think, but elected to proceed to trial, and are here attempting to sustain the judgment in which the trial resulted. The contention cannot be sustained.

The judgment will be reversed.

*Reversed.*